UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

MARY MARGARET CHAMPAGNE

VERSUS

U.S. COMMISSIONER, SOCIAL
SECURITY ADMINISTRATION

CIVIL ACTION NO. 6:16-cv-01116

JUDGE FOOTE

MAGISTRATE JUDGE HANNA

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be reversed and remanded

for further administrative action.

## ADMINISTRATIVE PROCEEDINGS

The claimant, Mary Margaret Champagne, fully exhausted her administrative

remedies before filing this action in federal court. She filed an application for

disability insurance benefits, alleging disability beginning on February 1, 2013.[1]  Her

application was denied,[2] and she requested a hearing, which was held on November

26, 2014 before Administrative Law Judge Kim A. Fields.[3]  The ALJ issued a

---

[1]     Rec. Doc. 5-1 at 111.

[2]     Rec. Doc. 5-1 at 50.

[3]     Rec. Doc. 5-1 at 29-49.

decision on January 9, 2015,[4] concluding that the claimant was not disabled within the meaning of the Social Security Act from the alleged disability onset date through the date of the decision. The claimant asked for review of the decision, but the Appeals Council concluded that there was no basis for review of the ALJ's decision.[5] Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g). The claimant then filed this action seeking review of the Commissioner's decision.

## SUMMARY OF PERTINENT FACTS

The claimant was born on December 17, 1958.[6] At the time of the ALJ's decision, she was 56 years old. She graduated from high school and completed a basic accounting course at T.H. Harris Vocational-Technical School.[7] She has relevant work experience as a bookkeeper for a retail hardware business.[8] She alleged that she became disabled on February 1, 2013[9] due to severe spinal stenosis, arthritis,

---

[4]     Rec. Doc. 5-1 at 18-24.

[5]     Rec. Doc. 5-1 at 4.

[6]     Rec. Doc. 5-1 at 33, 111.

[7]     Rec. Doc. 5-1 at 128.

[8]     Rec. Doc. 5-1 at 129.

[9]     Rec. Doc. 5-1 at 111.

depression, sleep apnea, obesity, hypothyroidism, and high blood pressure.[10]  At the
time of her application, she was 5' 3" and weighed 364 pounds.[11]

According to the record, the claimant has treated with Dr. Benjamin T. Degatur
of Breaux Bridge, Louisiana, since 2012.  On February 2, 2012,[12] the claimant met
with Dr. Degatur to discuss laboratory results.  He diagnosed her with hypertension,
osteoarthritis, hypothyroidism, recurrent left lower leg cellutitis, and morbid obesity.
She also complained about left knee pain.

On January 16, 2013,[13] the claimant again saw Dr. Degatur, complaining about
pain in her left buttock for the past five days that began after she picked up a heavy
box.[14]  She described the pain as sharp but not radiating and made worse by sitting
and walking.  She also complained about numbness in her left foot.  She was unable
to get on the exam table, was tender to palpation at the left sacroiliac ("SI") joint, had
decreased lumbar musculature, and a positive modified (while seated) straight leg
raise test.  Dr. Degatur diagnosed muscular strain, left sciatica, and morbid obesity.

---

[10]     Rec. Doc. 5-1 at 51.

[11]     Rec. Doc. 5-1 at 127.

[12]     Rec. Doc. 5-1 at 266.  Dr. Degatur's treatment notes are very difficult to read.

[13]     Rec. Doc. 5-1 at 264.

[14]     In certain later treatment notes, the onset of this pain was correlated to a fall.  Rec.
Doc. 5-1 at 236-242.

She was given an injection; told to stop taking Celebrex; was prescribed Naprosyn, Lortab, and Flexeril; and was advised to report a failure to improve. Dr. Degatur indicated that he would consider referring her to physical therapy.

On January 23, 2013, the claimant called Dr. Degatur's office and complained of weakness, numbness, and leg pain. Her muscle relaxers were refilled and it was noted that she was being referred to physical therapy.

On January 24, 2013, Dr. Degatur referred the claimant to physical therapy.[15] The claimant presented for physical therapy at Acadiana Physical Therapy and Sports Medicine on January 30, 2013 and February 1, 2013.[16] She told the physical therapist that she had undergone lumbar spine surgery in 1988. She also reported that she began having hip pain about three months earlier, which became severe and was accompanied by left buttock pain as well as numbness and tingling in her entire left leg. She had developed a fear of falling due to the numbness in her left leg. She also reported that a steroid injection the prior week had provided only mild relief. The claimant was using a rolling walker. She was advised to avoid any heavy lifting and to avoid walking without the walker. The therapist found her to be tender to palpation at the left piriformis muscle. She exhibited an abnormal gait consisting of

---

[15]     Rec. Doc. 5-1 at 283.

[16]     Rec. Doc. 5-1 at 186-193.

decreased stance time and weight-bearing on her left leg. On her second visit, she reported soreness but decreased pain. She did not return to physical therapy after the second visit.

On February 6, 2013, the claimant called Dr. Degatur's office and reported that she was having pain, was unable to sit, was having a hard time walking, and did not know what to do. She was instructed to go to a hospital emergency room for evaluation.[17]

The claimant visited the emergency department of Lafayette General Medical Center on February 6, 2013,[18] complaining about sharp, achy, and stabbing low back pain that she rated at ten on a scale of one to ten. She stated that the pain radiated into her left buttock and leg. She also complained of difficulty emptying her bladder while sitting due to pain. The differential diagnosis was lumbar strain, sciatica. She was prescribed Flexeril and Norco.

On February 14, 2013, the claimant returned to Dr. Degatur.[19] She complained that her pain had worsened since her last visit and that Naprosyn, Lortab, and Flexeril gave very little improvement. She reported that physical therapy had worsened her

---

[17]     Rec. Doc. 5-1 at 263.

[18]     Rec. Doc. 5-1 at 194-197, 279-281.

[19]     Rec. Doc. 5-1 at 262.

pain, which she described as sharp, shooting pain down her left leg into the calf. She reported that she had been spending most days in bed due to the pain. She stated that her left foot had progressively become more numb and that her left leg was also becoming numb. She also described having difficulty voiding urine and taking a long time to void. She told Dr. Degatur about her visit to the ER and her prior lumbar surgery. Upon examination, Dr. Degatur found that the claimant had tenderness to palpation over the lumbar spine, left paraspinal musculature, left buttock, and left ischial tuberosity ("the sit bones"), as well as decreased sensation over her left foot and the lower part of her left leg. Her left foot was cool to the touch, and a straight leg raise test on the left was positive. Dr. Degatur's impressions were left sciatica, lumbar disc disease, left ischial tuberosity pain, and morbid obesity. His plan was to schedule x-rays and an MRI. He prescribed Norco and Flexeril.

X-rays of the claimant's lumbar spine obtained on February 14, 2013 showed advanced disc disease at L5-S1 with disc space narrowing, end plate sclerosis, anterior spurring, and posterior spondylosis.[20] An MRI of the claimant's lumbar spine, obtained on February 23, 2013, showed post-surgical changes at L5-S1; broad disc protrusions at L3-4 and L4-5 combined with pedicle shortening and facet and ligament disease causing a tight central canal stenosis along with foramen

---

[20]     Rec. Doc. 5-1 at 277, 230-231.

impingement greater to the right at L3-4; and borderline congenital central canal stenosis at the L3-4 level.[21]

On March 28, 2013, the claimant consulted a pain management specialist, Dr. Michael Jennings of Louisiana Pain Management Anesthesiology & Pain Consultants.[22] She gave a history of back pain that started with a fall in October and progressed to pain down to her foot by January that she initially treated with bed rest, then two sessions of physical therapy, then an emergency room visit before returning to Dr. Degatur who ordered an MRI and conservative treatment. Dr. Jennings noted an abnormal rocking and limping gait. He found that the claimant had edema to the tibial tuberosity, positive straight leg raises on both sides, abnormal sensation in her legs, decreased muscle tone and muscle strength in her legs, and abnormal coordination and balance that he attributed to her obesity. He diagnosed lumbar herniated nucleus pulposus ("HNP"), lumbar radiculopathy, lumbar stenosis, and morbid obesity. He stopped her Tramadol, advised her to continue using her CPAP machine, and prescribed Neurontin, Celebrex, Robaxin, and Lortab. He ordered the urgent scheduling of a lumbar epidural steroid injection ("LESI") at L3-4.

---

[21]     Rec. Doc. 5-1 at 274-275.

[22]     Rec. Doc. 5-1 at 236-242.

On April 17, 2013, Dr. Jennings administered a lumbar epidural steroid injection ("LESI") at L4-5.[23]  Dr. Jennings noted that the claimant had reported left buttock pain radiating into her thigh to her calf, stopping before her ankle.  She told him that Neurontin had taken away her right-sided pain and helped the left-sided pain, helped with sleep, and made the tingling go away.  His impressions were HNP at L3-4 and L4-5, lumbar radiculopathy, spinal stenosis, and neuroforaminal stenosis.  His plan was to schedule the second LESI in three to four weeks and refer the claimant to Dr. Cormier.

On April 22, 2013, the claimant saw Dr. Degatur for a wellness examination.[24]  She reported that she had seen Dr. Jennings and that he had administered the LESI and prescribed Hydrocodone, Methocarbamol, and Gabapentin, all of which gave some improvement in pain.  She also reported that Dr. Jennings had referred her to Dr. Cormier for a neurosurgery evaluation.  She told Dr. Degatur that she had been let go from her employment due to absences associated with her back pain.  Diagnoses included hypertension, hypothyroidism, morbid obesity, lumbar disc disease, and Vitamin D deficiency.

---

[23]     Rec. Doc. 5-1 at 198-219.

[24]     Rec. Doc. 5-1 at 260.

On August 13, 2013, the claimant again saw Dr. Jennings.[25] She reported that the LESI gave her an 80% functional improvement that was "still helping for now." Dr. Jennings noted that the claimant had a slow, wide gait, sat and stood slowly, had low back tenderness, and complained of left leg pain radiating to mid-knee that was better since the LESI.

The claimant first saw Dr. Jason Cormier on September 5, 2013.[26] She described back pain with radiation into her left buttock down into her left calf with occasional numbness in those areas. She said the pain was sometimes burning and shocking. She reported having to lean forward to walk and stated that she felt better when sitting than when standing. Dr. Cormier found that she had no deficits in muscle strength but that she walked with a kyphotic posture. He interpreted her MRI of February 23, 2013 as showing notable disc bulges at L3-4 and L4-5 with ligamentous hypertrophy and facet arthropathy causing marked and severe central canal stenosis with associated neuroforaminal stenosis. Dr. Cormier recommended decompression surgery at L3-4 and L4-5. He did not think the claimant was capable of returning to work. The claimant indicated to him that she wanted to consider whether to proceed with surgery or to continue conservative treatment.

---

[25]     Rec. Doc. 5-1 at 234-235.

[26]     Rec. Doc. 5-1 at 291-294, 268-269.

On November 13, 2013, the claimant returned to Dr. Jennings.[27]  He again noted her morbid obesity, a recent weight gain, her wide gait, and her arthritic knees. He also noted that she sat and stood slowly and complained of pain with the weather, radiating to her left buttock and left calf.  She had positive straight leg raise tests.  He advised her to lose weight, walk, and watch her diet.  He diagnosed lumbar radiculopathy, stenosis, and HNP.  He prescribed Neurontin, Lortab, and Norco.

The claimant saw Dr. Cormier on November 25, 2013.[28]  Although she was "feeling pretty good," the claimant complained of continued left-sided pain radiating down her left leg and left lateral calf that comes and goes.  She described the pain as shocking.  She also complained about muscle spasms in her back, for which she was taking muscle relaxers.  Additionally, she stated that she had right-sided pain when lying down.  Dr. Cormier described her gait as normal, and he noted that she wanted to continue with conservative treatment because she had had some relief with an increase in her Neurontin dosage.  He encouraged her to lose weight, as this might also assist with the pain.

---

[27]     Rec. Doc. 5-1 at 332-333.

[28]     Rec. Doc. 5-1 at 286-290, 318-319.

The claimant was examined by Dr. Andriette M. Fitch on February 15, 2014, at the request of Disability Determination Services.[29]  The claimaint told Dr. Fitch that she had back pain that is sharp, constant, and radiating down her left leg, associated with numbness, worse with standing, and better with lying down.  She rated the pain as nine out of ten.  She indicated that she gets some relief with medication.  She told Dr. Fitch that she could dress herself with help, feed herself, stand for two minutes, stand for one hour out of an eight-hour day, walk for five minutes on level ground, sit for one hour, lift ten pounds, and drive.  She stated that she could not do household chores.

Dr. Fitch's examination revealed that the claimant was 5' 3" tall and weighed 367 pounds.  Her ambulation was slow and taxing.  She used a walker throughout the examination, particularly for balance.  She had difficulty getting on and off the exam table as well as getting up out of a chair.  She was unable to take her shoes off.  Although she had trouble flexing her knees and walked with a walker, Dr. Fitch stated that the claimant had a normal gait.  The claimant complained of pain upon flexion of her lumbar spine and refused examination of her left hip due to pain.  She could not walk on her heels, could not walk on her toes, and could not heel-and-toe walk.  She could not squat due to pain, her weight, and the limited range of motion in her

---

[29]     Rec. Doc. 5-1 at 295-299.

knees, hips, and extremities. The claimant had a positive straight leg raise test on the left. Dr. Fitch noted that the claimant had significant limitation in the range of motion in her legs. Dr. Fitch noted functional limitations in her ability to bend, stand, squat, and lift heavy weights.

On February 18, 2014, the claimant saw Nurse Practitioner Stella Souther in Dr. Jennings's office.[30] She complained of low back pain radiating into her left leg and stated that walking and prolonged sitting worsened the pain. She also complained of numbness and weakness in her left leg. The treatment note indicated that the LESI was not repeated because it did not help. The claimant's gait was noted as being slow and wide. She sat and stood slowly and ambulated with a walker for support. Straight leg raise tests were positive. It was noted that she had degenerative joint disease ("DJD") in her knees, lumbar radiculopathy, stenosis, and HNP.

The claimant again saw Dr. Degatur on April 10, 2014.[31] The diagnoses were osteoarthritis, morbid obesity, hypothyroidism, and hypertension. She requested refills of her medications, particularly Celebrex, which she said helps with her back pain, knee pain, and hip pain. She indicated that she was continuing to follow up with Dr. Jennings for pain management and was considering surgery with Dr.

---

[30]     Rec. Doc. 5-1 at 330-331.

[31]     Rec. Doc. 5-1 at 312-314.

Cormier but needed to wait until July when she would have insurance coverage. It was noted that she used a walker.

On May 14, 2014, the claimant again saw Nurse Souther at Dr. Jennings's office.[32] She complained of a new burning pain on the side of her left leg. The treatment note indicated that she used a walker to ambulate due to severe obesity and severe DJD with bilateral leg weakness and increased fall risk. Her gait was described as slow. It was noted that she sat and stood slowly, was unable to stand erect and flex forward, and had tenderness across her lumbar spine on palpation with radiating pain down her leg and foot that increased with flexion. She was advised to continue using the walker to ambulate. Her Neurontin dosage was increased. The diagnoses assigned were lumbar radiculopathy, stenosis, HNP, and DJD in her knees.

On July 10, 2014, the claimant again saw Dr. Cormier and indicated that she would like to continue conservative treatment.[33]

The claimant returned to Nurse Souther in Dr. Jennings's office on August 13, 2014.[34] It was noted that Neurontin helped with her pain and that she used a walker to ambulate. Her gait was described as slow with walker. Tenderness was noted on

---

[32]     Rec. Doc. 5-1 at 328-329.

[33]     Rec. Doc. 5-1 at 316-317.

[34]     Rec. Doc. 5-1 at 316-327.

palpation of her lumbar region, and she complained of bilateral leg pain radiating from her buttocks. She had positive straight leg raises bilaterally. She was advised to use a walker and fall precautions.

The claimant saw Nurse Souther in Dr. Jennings's office again on November 12, 2014, in follow up for pain management.[35] She reported pain in her lower back as well as left leg pain, and she rated both as seven out of ten. She described weakness and muscle spasms in her left leg as well as occasional numbness in that leg. The pain reportedly caused difficulty sleeping and extreme worry. She indicated that she had had no pain relief from the LESI.[36] She had gained weight, which she attributed to diabetes. Nurse Souther evaluated her gait and found both abnormal movement and abnormal proprioception. The claimant had great difficulty transferring and ambulating around the room despite using a walker. It was noted that she ambulates with a kyphotic posture. She had moderate tenderness on the midline lumbar region as well as moderate tenderness on the left and right hip and leg, and severe tenderness in her knees. It was noted that her range of motion was reduced upon lumbar flexion, lumbar extension, left hip, right hip, left knee, and right

---

[35]     Rec. Doc. 5-1 at 321-325.

[36]     However, she did report an 80% improvement in functionality following the injection. Rec. Doc. 5-1 at 234-235.

knee, accompanied by moderate pain upon lumbar flexion and extension. Muscle strength in her both legs was 4/5. The left leg was weak with leg extension, and her right leg muscle strength was weak upon hip flexion. Sensation to both legs was decreased. Straight leg raise tests were positive in both legs. Edema from arthritis was noted at the knees. Bilateral foot pain and numbness due to diabetic neuropathy was noted. Nurse Souther noted that the claimant's prognosis was poor. She advised that Norco, Neurontin, and Robaxin should be continued.

On November 26, 2014, the claimant testified at a hearing regarding her symptoms and her functionality. She testified that she could drive short distances, could stand up for about three minutes at a time, could sit for half an hour to an hour without rising, and could lift nothing heavier than a gallon-sized container. She testified that she used a walker. She stated that she did very little housework, and did some of it – sweeping, mopping, and dishes, for example – while seated in a rolling office chair. She folded clothes but did not do laundry. She shopped only where there were scooters. She stated that she had sleep apnea, which was improved by a CPAP machine; and thyroid issues that caused dry skin, loss of hair, constipation, and an eating disorder. The claimant stated that Dr. Cormier had recommended that she undergo lumbar spine surgery, but she was hesitant because of complications from her first lumbar surgery, which resulted in problems with her bowels and bladder.

She explained that she continued to have pain with bowel movements and urination, both of which also took a long time. She stated that she had difficulty going to sleep and staying asleep. She claimed that she could dress herself but could not put on socks or tie shoes. She said she could bathe herself, but only bathed when someone else was in her house. She also used a shower chair, a special nozzle from the shower head, and assistive devices around the bathtub. She denied being able to crawl, crouch, or kneel and stated that she cannot pick up an object that she drops on the floor. She stated that she took  medication for allergies, had difficulty with hot temperatures, and was recently diagnosed with carpal tunnel syndrome.[37]

At the time of the hearing, the claimant was taking a long list of prescription and over-the-counter medications, including Gabapentin for nerve damage, Methocarbamol to relax her muscles, Hydrocodone/Acetaminophen for pain, Celebrex for arthritis, Vitamin D for low liver enzymes, Benazepril for high blood pressure, Amlodipine Besylate for high blood pressure, Furosemide for fluid, Levothyroxine for her thyroid, fish oil for her heart, red yeast rice for high blood pressure, and Allegra for allergies.[38]

---

[37]     No evidence of that diagnoses is found in the record.

[38]     Rec. Doc. 5-1 at 174.

<u>**ANALYSIS**</u>

**A.** <u>**STANDARD OF REVIEW**</u>

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[39] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[40] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[41]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[42] In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[43] Conflicts in the

---

[39]     *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[40]     *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[41]     *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[42]     42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[43]     *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

evidence[44] and credibility assessments[45] are for the Commissioner to resolve, not the courts. Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[46]

**B.**     **ENTITLEMENT TO BENEFITS**

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[47] A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[48] A claimant is disabled only if his physical or mental impairment

---

[44]     *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[45]     *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[46]     *Wren v. Sullivan*, 925 F.2d at 126.

[47]     See 42 U.S.C. § 423(a).

[48]     42 U.S.C. § 1382c(a)(3)(A).

or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[49]

## C.  EVALUATION PROCESS AND BURDEN OF PROOF

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.  This process requires the ALJ to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[50]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[51] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the

---

[49]    42 U.S.C. § 1382c(a)(3)(B).

[50]    20 C.F.R. § 404.1520.

[51]    20 C.F.R. § 404.1520(a)(4).

record.[52]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[53]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[54]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[55]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[56]  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[57]

---

[52]    20 C.F.R. § 404.1545(a)(1).

[53]    20 C.F.R. § 404.1520(e).

[54]    *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[55]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[56]    *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[57]    *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

**D.   THE ALJ'S FINDINGS AND CONCLUSIONS**

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since February 1, 2013.[58]  This finding is supported by substantial evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments:  disorders of the back and exogenous obesity.[59]  This finding is supported by substantial evidence in the record.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[60]  The claimant challenges this finding.

The ALJ found that the claimant has the residual functional capacity to perform sedentary work except that she can only sit for one hour at a time and then needs to stand for a short period before returning to a seated position.[61]  The claimant challenges this finding.

---

[58]      Rec. Doc. 5-1 at 20.

[59]      Rec. Doc. 5-1 at 20.

[60]      Rec. Doc. 5-1 at 20-21.

[61]      Rec. Doc. 5-1 at 21.

At step four, the ALJ found that the claimant is capable of performing her past relevant work as a bookkeeper.[62]  Therefore, the ALJ did not progress to step five. The claimant challenges this finding.

## E.   THE ALLEGATIONS OF ERROR

The claimant contends that the ALJ erred (1) improperly evaluated medical evidence from the state agency review physician; (2) improperly evaluated whether the claimant's impairments meet or equal the requirements of Listing 1.02 or Listing 1.04; (3) improperly evaluated and weighed relevant evidence from the claimant's former employer; and (4) failed to support his residual functional capacity evaluation with substantial evidence.

## F.   THE ALJ IMPROPERLY EVALUATED MEDICAL EVIDENCE FROM DR. HONIGMAN

The ALJ gave great weight to the opinions of the state agency review physician, Dr. Timothy Honigman.  Although Dr. Honigman did not examine the claimant at any time, the ALJ found that Dr. Honigman's opinions are consistent with the medical evidence in the record.  Dr. Honigman opined that the claimant could perform a full range of sedentary work but with a series of notable exceptions or limitations.  He found that she could only occasionally climb ramps and stairs,

---

[62]     Rec. Doc. 5-1 at 23.

balance, stoop, kneel, crouch, and crawl. He further found that she must avoid all

exposure to hazards and must use a walker for balance. However, the ALJ failed to

include in his residual functional capacity finding any of the exceptions or limitations

that Dr. Honigman found to be necessary and that the ALJ found to be consistent with

the medical evidence in the record. Therefore, although the ALJ stated that he was

giving great weight to Dr. Honigman's opinions, he did not actually adopt all of Dr.

Honigman's findings. Instead, he adopted only Dr. Honigman's opinion that the

claimant is capable of sedentary work. Further, the ALJ provided no explanation for

why the limitations noted by Dr. Honigman did not become a part of his own

evaluation of the claimant's residual functional capacity.

Although the findings of a state agency medical consultant are not binding on

the ALJ,[63] the ALJ is required to explain why a certain amount of weight is given to

the medical experts' opinions.[64] Additionally, even though the determination of a

claimant' residual functional capacity is reserved to the Commissioner, opinions from

a medical source about this issue must never be ignored.[65] Here, the ALJ offered no

explanation for why certain parts of Dr. Honigman's evaluation were credited but

---

[63]     *Reyes v. Sullivan*, 915 F.2d 151, 154 (5th Cir. 1990).

[64]     SSR 96-6p, 1996 WL 374180, at *2.

[65]     SSR 96-5p, 1996 WL 374183, at *1.

other parts were ignored.  The ALJ also failed to assign any weight to the opinions of Dr. Degatur or Dr. Jennings.  This was error, requiring that this matter be remanded so that the medical opinions can be properly weighed.

## G. THE ALJ IMPROPERLY EVALUATED WHETHER THE CLAIMANT'S IMPAIRMENTS MEET THE REQUIREMENTS OF LISTING 1.02 OR LISTING 1.04

The record is replete with evidence that the claimant has both a HNP in her lumbar spine and DJD in her knees.  Therefore, it would have been appropriate for the ALJ to determine whether she meets the requirements for Listing 1.02, which addresses the major dysfunction of a joint, and Listing 1.04, which addresses disorders of the spine.

Listing 1.02 concerns the "[m]ajor dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)."  A more specific criterion for this listing is the involvement of a major peripheral weight-bearing joint (such as a knee).

But the ALJ did not evaluate whether the claimant meets Listing 1.02.  This was error.  The claimant contends that she is disabled due to several conditions,

including arthritis, and knee pain is a consistent complaint throughout the medical evidence. Consultative examiner Dr. Fitch noted that the claimant had trouble flexing her knees, and the claimant requires a walker for ambulation. There is a plethora of medical evidence establishing that the claimant's knees are impaired. Therefore, the ALJ should have considered whether this impairment meets the criteria for Listing 1.02, and the ALJ's failure to determine whether the claimant's knee condition meets Listing 1.02 is an error that requires remand of this action.

The ALJ did evaluate whether the claimant satisfies the criteria of Listing 1.04, disorders of the spine. Under this listing, a disorder of the spine, such as the HNP that the claimant has, is disabling if it results in compromise of a nerve root or the spinal cord and either:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

The ALJ summarily concluded that the claimant does not meet this listing by stating that the medical evidence does not establish nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis and because there is no evidence that the claimant cannot ambulate effectively. The ALJ reached this conclusion by failing to consider any evidence from Dr. Cormier. The ALJ gave Dr. Cormier's opinions no weight because, on a single occasion, Dr. Cormier stated that he thought the claimant was unable to return to work. The ALJ is correct that a physician's statement that a claimant is disabled or unable to work is not a medical opinion entitled to deference but a legal conclusion that is reserved to the Commissioner.[66] However, the ALJ erred in rejecting all of Dr. Cormier's clinical findings and medical opinions because he opined on the claimant's ability to return to work.

---

[66] *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003) (per curiam); see 20 C.F.R. §§ 404.1527(d)(1), 404.1527(d)(3), 416.927(d)(1), 416.927(d)(3).

An "ALJ is required to discuss the evidence and explain the basis for his findings at each unfavorable step of the sequential evaluation process."[67] More particularly, "[t]he ALJ should identify the listed impairment for which the claimant's symptoms fail to qualify and provide an explanation as to how he or she determined that the symptoms are insufficiently severe to meet any listed impairment."[68] MRI testing showed objective evidence of HNP with spinal stenosis and impingement at the L3-4 level, and Dr. Cormier has recommended decompression surgery. The record also documents numerous positive straight leg raise tests. The ALJ erred in failing to consider this evidence when determining whether the claimant meets Listing 1.04. Because the ALJ did not compare the claimant's symptoms against the criteria for the listing, this Court is unable to determine whether the Commissioner's conclusion at step three is based on substantial evidence, and remand is required.[69]

---

[67]     *Williams v. Astrue*, No. 09-0130, 2010 WL 989216, at * 3 (W.D. La. Mar. 15, 2010), citing *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007), which in turn cites 42 U.S.C. § 405(b)(1).

[68]     *Savoie v. Colvin*, No. 14-30-JJB-RLB, 2015 WL 1004217, at *5 (M.D. La. Mar. 5, 2015).

[69]     See, e.g., *Reyna v. Colvin*, No. 5:14-CV-147-C, 2015 WL 1515251, at *4 (N.D. Tex. Apr. 1, 2015); *Marsh v. Comm'r of Soc. Sec. Admin.*, No. 4:13CV312, 2015 WL 1288656, at *3 (E.D. Tex. Mar. 20, 2015) *Watson v. Colvin*, No. 3:13-CV-583-BF, 2014 WL 1281473, at *4 (N.D. Tex. Mar. 31, 2014); *Joseph v. Astrue*, No. 6:10-CV-01315, 2012 WL 601477, at *6 n. 74 (W.D. La. Jan. 24, 2012) report and recommendation adopted, No. 6:10-CV-01315, 2012 WL 601586 (W.D. La. Feb. 22, 2012); *Robertson v. Astrue*, No. 3-10-CV-1669-BD, 2011 WL 3836915, at *4 (N.D. Tex. Aug. 26, 2011); *Lynch v. Astrue*, No. 7–10–CV–0032–BD, 2011 WL 1542056 at *3–4 (N.D.Tex. Apr.22, 2011).

Furthermore, the ALJ's finding that there is no evidence that the claimant's back disorder has resulted in an ability to ambulate effectively is not based on substantial evidence in the record. In Listing 1.00, the Social Security regulations define what is meant by an inability to ambulate effectively:

> Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning. . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . . [E]xamples of ineffective ambulation include. . . the inability to walk without the use of a walker. . . .

The claimant uses a walker; therefore, she does not ambulate effectively. If her need for a walker is attributable to her spine disorder, then her impairment likely meets the criteria of Listing 1.04. Accordingly, this Court finds that the ALJ failed to properly evaluate whether the claimant meets the criteria of this listing.

This Court further notes that the issue is not merely whether the claimant meets the criteria of this listing but also whether her impairments, singly or in combination, medically equal the criteria of a listing. There is no evidence in the ALJ's ruling indicating that he considered whether the claimant's DJD, when combined with her HNP, results in impairments that are equivalent to those of either Listing 1.02 or Listing 1.04. Accordingly, this matter must be remanded for further consideration.

**H.** **THE ALJ IMPROPERLY EVALUATED AND WEIGHED RELEVANT EVIDENCE FROM THE CLAIMANT'S FORMER EMPLOYER**

On December 2, 2014, Renee Broussard of Guidry's Hardware and Supply, Inc., the claimant's former employer, provided a letter to the claimant's counsel documenting the claimant's employment history and explaining why she lost her job. The letter states that the claimant's back problems prevented her from being able to sit upright for any length of time, and it further states that, despite accommodations such as working from home and working part time, the claimant was unable to resume her duties. According to her former employer, the claimant "was physically unable to" return to work.

As noted above, the ultimate issue of whether a claimant is capable of working is reserved to the Commissioner for resolution. However, an ALJ must resolve that issue by considering all of the evidence in the record, including lay witness testimony. As noted in the Social Security Regulations,

> "Non-medical sources" who have had contact with the individual in their professional capacity, such as teachers, school counselors, and social welfare agency personnel who are not health care providers, are also valuable sources of evidence for assessing impairment severity and functioning. Often, these sources have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time. Consistent with 20 CFR 404.1513(d)(4) and 416.913(d)(4), we also

consider evidence provided by other "non-medical sources" such as spouses, other relatives, friends, employers, and neighbors.[70]

Thus, the Social Security regulations expressly indicated that a claimant's employer might have important information concerning a claimant's functionality that should be considered in determining whether the claimant is disabled. The ALJ erred in failing to address the information provided by the claimant's former employer or to explain whether that information was assigned any weight in deciding whether the claimant is disabled. Therefore, this case must be remanded for consideration of the former employer's letter.

I.    **THE ALJ ERRED IN EVALUATING THE CLAIMANT'S RESIDUAL FUNCTIONAL CAPACITY**

As noted above in Paragraph F, this Court finds that the ALJ erred in weighing Dr. Honigman's opinions and failed to assign weight to the opinions of Dr. Jennings and Dr. Degatur. As noted above in Paragraph G, the ALJ erred by discounting Dr. Cormier's medical findings and opinions. As noted above in Paragraph H, the ALJ erred in evaluating the evidence submitted by the claimant's former employer. Accordingly, this Court finds that the ALJ erred in evaluating the claimant's residual

---

[70]    SSR 06-03p, 2006 WL 2329939, at *3.

functional capacity. Therefore, this matter must be remanded so that the claimant's residual functional capacity may be properly assessed.

<h2>CONCLUSION AND RECOMMENDATION</h2>

For the reasons set forth above, this Court recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to (1) properly weigh the opinions of all of the physicians who have treated the claimant since the alleged disability onset date, (2) properly evaluate whether the claimant's impairments meet or medically equal the requirements of Listing 1.02 and Listing 1.04, (3) properly consider and weigh the lay witness evidence provided by the claimant's former employer, and (4) again evaluate the claimant's residual functional capacity. The claimant should be afforded an opportunity to supplement the record with updated medical records and to testify at another hearing. Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).[71]

---

[71]    See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[72]

Signed in Lafayette, Louisiana, this 30th day of August 2017.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[72]     See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).